[S. F. No. 21192. In Bank. Feb. 14, 1963.]

JOSEPH DI GAETA, Petitioner, v. THE STATE BAR OF
CALIFORNIA, Respondent.

Merrill, Hooper & Miller and Edward L. Merrill for Petitioner.

Garrett H. Elmore for Respondent.

THE COURT.—This is a proceeding to review a recommendation of the Board of Governors of the State Bar of California that petitioner be suspended from the practice of law for six months, execution to be stayed upon certain conditions of probation, including the following: (1) Actual suspension from the practice of law for three months; and (2) payment by petitioner to the Perezes of $1,750 (and furnishing the State Bar satisfactory evidence thereof) within the first three months, failure to make such payment within that time to extend the period of actual suspension from practice until such condition is complied with (but in no event is the suspension from practice under the order herein to exceed six months).

*Questions*: First. *Does the record establish that petitioner's acts were not in good faith but were done to take advantage of the situation and to obtain, if possible, the sum of $1,750 for his own use?*

*Yes.* The burden is upon one seeking a review of a recommendation of the Board of Governors to show that its findings are not supported by the evidence or that its recommendation is erroneous or unlawful. (*Rock* v. *State Bar*, 57 Cal.2d 639, 642 [2] [21 Cal.Rptr. 572, 371 P.2d 308].) In the present case the record discloses that petitioner has not sustained this burden.

 It appears that one Ceballos, a contractor and real estate broker and salesman, owned real property in Walnut Creek and in El Cerrito. The latter was known as 1243 Brewster Drive. Petitioner and Ceballos were brothers-in-law, Ceballos being married to petitioner's sister.

Mr. and Mrs. Perez were related to Ceballos in some fashion not made clear by the record. According to petitioner, after the transaction here involved he learned that Ceballos was "related some way, either by in-laws or something, to the Perezes." Petitioner testified that he did not recall that he had ever met the Perezes prior to the State Bar hearings

or that Ceballos had ever discussed the Perezes with him prior to July 1960. The relationship between petitioner and the Perezes thus does not appear close.

As a contractor, Ceballos had been unsuccessful. Shortly before the events in question, according to his testimony, he "went broke" twice.

Ceballos and petitioner had had business and financial transactions together. Ceballos had built petitioner's home and remodeled an office building owned by petitioner. Petitioner had assisted Ceballos in his efforts to obtain jobs as a contractor on which a bond was required. He testified that Ceballos' "financial situation wasn't such for his line of credit, so I had taken him to my bank . . . introduced him to the bank manager . . . and we had deposited into his account $5,000.00."

About that time petitioner took title to the Brewster Drive property as security. According to petitioner, Ceballos, though he did not get the contractor's jobs, had spent some $2,500, $2,600, or $2,700 of the $5,000 to pay his (Ceballos') creditors.

Petitioner advanced Ceballos money for the latter's payroll and other jobs he was doing, in the amount of about $1,900. Petitioner was required to pay off some mechanics' liens and bills on his office building, amounting to approximately $5,000. Petitioner testified that he "also got stuck," to the extent of $4,100, on the work done on his home by Ceballos.

At a time not disclosed precisely by the record, petitioner had a final payment due on his own home in Lafayette, and there were "some grumblings for liens against the office building." According to petitioner, he called Ceballos and told him that "unless he paid me $2,000.00 I wasn't to go any further . . . there were three notes secured by deeds of trust against the [Brewster Drive] property, and there was also a writ of attachment by Sanders Glass. And I told him I wasn't going to go any further unless he paid me some money on account of what he owed me. . . ." At this time, according to petitioner, he recouped the remaining balance of the $5,000 which he had placed in Ceballos' name, as above set forth, for Ceballos to attempt to obtain bonded contractor's jobs.

One Muhm held a second deed of trust covering both the Brewster Drive property and Ceballos' Walnut Creek property. Muhm, according to Ceballos, was dissatisfied because the note was due and the Brewster Drive property was in

another person's name (i.e., it had been transferred to petitioner in February 1960). Ceballos testified that Muhm agreed that upon payment to him of the accrued interest, he would "hold on and carry the second deed of trust . . . on the Walnut Creek property alone."

As a result of a meeting between Ceballos and Mr. and Mrs. Perez at the latter's home on or about July 14, 1960, the Perezes obtained a cashier's check for $1,750, dated July 15, 1960, payable to petitioner. This check bore on its face the following notation: "For the Account of Elizabeth A. Perez to be secured by deed of trust on property known as 1243 Brewster Drive, El Cerrito, Calif."

Ceballos left the $1,750 check at petitioner's home in Lafayette with his wife. Petitioner received the check and deposited it in his personal bank account in Albany. He saw the typed statement on the face of the check quoted above before he deposited it, but he never inquired of the Perezes about the notation on the check or the agreement between them and Ceballos.

Petitioner, out of said $1,750, made a payment of $764.54 to Mr. Muhm, to pay the interest on the latter's deed of trust to date. Mr. Muhm then released the Brewster Drive property.

Petitioner claimed and used the remaining balance of $985.46 as his own, treating the funds as a payment "on account" by Ceballos.

Petitioner sold the Brewster Drive property in October 1960 for $30,500. After deduction of broker's commission, withholding of $600 for termite work, and payment of the amount due under the first deed of trust, petitioner received $1,383.21 in cash and a second deed of trust for $4,000.

Petitioner testified that after seeing the notation on the check, he contacted Ceballos and asked him about it and that Ceballos informed him it was an error, as the agreement was that the Perezes were to receive a second deed of trust on his Walnut Creek property. Nevertheless, when the Perezes eventually contacted petitioner in October 1960, petitioner did not inquire whether they had received a second deed of trust on the Walnut Creek property. Rather, when they indicated that they were still waiting to receive a second deed of trust, petitioner merely stated that at no time had he promised to give them a deed of trust and that that was a matter between them and Ceballos.

The Perezes have never received a deed of trust from either

Ceballos or petitioner; and they have never received any payment on the indebtedness from either Ceballos or petitioner, even though the Brewster Drive property was later released from the Muhm second deed of trust and was sold by petitioner.

The foregoing evidence supports the findings of the Board of Governors that petitioner's acts in relation to the $1,750 were not in good faith but were done to take advantage of the situation and obtain such sum for his own use.

■ Second. *Was the discipline recommended by the Board of Governors excessive?*

*No.* The penalty recommended by the Board of Governors—six months' suspension, with three months' "actual" and probationary conditions, including restitution to the Perezes of $1,750—is not excessive. (*Krieger* v. *State Bar,* 43 Cal.2d 604, 611 [8] [275 P.2d 459].)

It is ordered that petitioner be suspended from the practice of law for six months. He is granted probation upon the following conditions:

(1) He is actually suspended from the practice of law for three months; and

(2) He is required to pay to Mr. and Mrs. Jesus Perez $1,750 (and to furnish the State Bar satisfactory evidence thereof) within the first three months. Failure to make such payment within that time will extend the period of actual suspension from the practice of law until such condition is complied with (but in no event is the suspension from practice under the order herein to exceed six months).

This suspension is to be effective 30 days after the date of the filing of this order.

Petitioner's application for a rehearing was denied March 13, 1963.