[L.A. Nos. 30164, 30272. In Bank. Dec. 13, 1974.]

ROBERT M. SILVER, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Phill Silver for Petitioner.

Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

## OPINION

**THE COURT.**—We review here a decision of the Disciplinary Board of the State Bar in L.A. 30164 that Robert M. Silver be publicly reproved for various acts of professional misconduct and a recommendation of the board in L.A. 30272 that petitioner be suspended from the practice of law for a period of two years with one year actual suspension. ■ Although the two disciplinary proceedings were heard by different local committees and were separately argued before the board, we exercise our prerogative to consider the proceedings contemporaneously. (*Black* v. *State Bar* (1972) 7 Cal.3d 676, 680 [103 Cal.Rptr. 288, 499 P.2d 968]; *Cutler* v. *State Bar* (1969) 71 Cal.2d 241, 243 [78 Cal.Rptr. 172, 455 P.2d 108].)

The proceedings in L.A. 30164 were initiated in 1971 when petitioner and Phill Silver, petitioner's father and partner, were charged with violating their oaths and duties as attorneys (Bus. & Prof. Code, §§ 6067, 6068, 6103), delaying an action with a view to their own gain (Bus. & Prof. Code, § 6128, subd. (b)), acquiring an interest adverse to their client in violation of rule 4 of the State Bar Rules of Professional Conduct, and purchasing property in violation of rule 8. The disciplinary board, substantially following the findings of the local committee, found, in part, that petitioner, "with a view to his own gain, caused the appeal on behalf of [his client] to be dismissed without her prior knowledge or knowing consent." The board followed the recommendation of the local committee and ordered public reproval; three members of the board dissented on the grounds that the discipline imposed was insufficient. The board, also upon recommendation of the local committee, dismissed charges against Phill Silver.

The proceedings in L.A. 30272 were initiated in 1972 when petitioner was charged with violating his oaths and duties as an attorney, wilfully commingling personal funds with those of a client in violation of rule 9 of the Rules of Professional Conduct, and misappropriating the client's funds, all acts involving moral turpitude and dishonesty. (Bus. & Prof. Code, § 6106.) The local committee found the charges against petitioner to be true and recommended that he be suspended for three years with one year actual suspension.[1] The disciplinary board unanimously adopted the findings of the local committee, but reduced the recommended suspension to two years, again with one year actual suspension. (See fn. 1, *supra*.) The board, in arriving at its recommendation, did not consider the record in the prior disciplinary proceeding.

---

[1]The recommendation was based, in part, on the finding that petitioner had engaged in misconduct in a separate matter which was tried before the same committee. The dilsciplinary board ordered that proceeding dismissed.

### 1. *The Robles matter (L.A. 30164).*

The record shows that Jean Robles retained Phill Silver, petitioner's father and partner, to prosecute an appeal from the property division portion of an interlocutory judgment of divorce. The property awarded to Raymond Robles, Jean's former husband, included the family residence and a rental duplex. Mrs. Robles received a judgment for $2,469, as well as other personal property; she believed that she had obtained an inadequate share of the community property.

Phill Silver successfully procured a court order that Mr. Robles pay attorney's fees, plus costs as they were incurred. Phill then assigned the case to petitioner, who promptly obtained two writs of execution against Mr. Robles' property. The first writ was issued in petitioner's name for $994.80, representing fees and costs; the second was issued in favor of Mrs. Robles for $1,504, the unpaid balance of the $2,469 judgment. Mrs. Robles levied on the family residence and a marshal's sale was scheduled; prior to the sale, however, the holder of the deed of trust purchased the property at a trustee's sale. As a consequence, since Mr. Robles was no longer the owner of the property, the subsequent levy on her behalf failed.

Petitioner then instructed Mrs. Robles to arrange a levy of execution on the duplex. She asked petitioner whether she should have the marshal execute *her unsatisfied* writ, but petitioner told her that it would be best for the marshal to levy on *his* writ. She followed his instructions; a sale was scheduled.

A few weeks before the sale, petitioner learned that the payments on the property, supposedly being made by Mr. Robles, were delinquent and that the holder of the deed of trust had issued notices of default and sale. Petitioner contacted Mrs. Robles and advised her to pay the amount due to avoid a foreclosure; she borrowed money from a friend and paid $825.54 to cure the default. According to Mrs. Robles, it was not until after she had paid the money to the bank that petitioner told her that she had not acquired title to the property.

Petitioner purchased the property at the marshal's sale. Several months later, petitioner agreed to dismiss Mrs. Robles' appeal in exchange for a quit-claim deed of Mr. Robles' remaining interest in the property, his right of redemption. Mrs. Robles testified that petitioner entered into this agreement with Mr. Robles' attorney without her knowledge or consent.

Petitioner spent a significant amount of time and effort in arranging to

sell the property. In April of 1970, petitioner received the proceeds remaining after escrow, $3,121.33. Petitioner at no time notified Mrs. Robles that the property had been sold; she first learned of the sale in June of 1970, when she contacted the realtor who had handled the sale.

Of the sale proceeds, petitioner determined that he was entitled to a personal fee of $1,000 and to reimbursement for funds he had spent to cure a second default. Petitioner also decided that his father was entitled to $1,000 for his services, although Mrs. Robles had previously paid him more than $700. The balance was never paid although Mrs. Robles had authorized petitioner to turn over $900 to a friend to whom she owed money.

From the time petitioner accepted Mrs. Robles' case in January of 1969, through June of 1970, petitioner repeatedly reassured her that the appeal was pending and that he was awaiting the preparation of the reporter's transcript. In fact, however, the transcript was never ordered.

Petitioner testified that he had acted in good faith in attempting to satisfy the judgment for costs on appeal so that a reporter's transcript could be ordered and an appeal taken from the interlocutory judgment. He testified that Mrs. Robles had agreed to the dismissal of her appeal, and that he acted, at all times, in the best interest of his client.

### Acquisition of adverse interest.

The undisputed evidence shows that petitioner violated rule 4 of the Rules of Professional Conduct which proscribes the acquisition by an attorney of an interest adverse to a client.

In *Ames* v. *State Bar* (1973) 8 Cal.3d 910, 917-919 [106 Cal.Rptr. 489, 506 P.2d 625], we held that a purchase by two attorneys of a note secured by a first deed of trust on a piece of property was the acquisition of an "adverse" interest within the meaning of rule 4 since their clients held the second deed of trust on the same property. We noted that the interest was adverse for two reasons. First, the attorneys were in the position to proceed with a sale under the senior lien which would extinguish the client's junior lien. (*Id.*, at pp. 918-919.) Second, the attorneys had obtained an interest in the subject matter of the litigation for which they had been retained, "contrary to their duty of undivided loyalty to their client. . . ." (*Id.*, at p. 919.)

Petitioner levied on the property of Mr. Robles, recorded the writ of execution as a lien, and eventually purchased the duplex at a marshal's sale. The property had been community property before Mrs. Robles' divorce;

she had retained petitioner's father to appeal the judgment which awarded Mr. Robles ownership of the property; thus the property was the subject of the litigation for which petitioner bore the responsibility. (See *McArthur* v. *Goodwin* (1916) 173 Cal. 499, 503 [160 P. 679]; *Valentine* v. *Stewart* (1860) 15 Cal. 387.) The duplex, moreover, constituted the only property which Mr. Robles owned which could be used to satisfy Mrs. Robles' $1,500 judgment[2] since the family residence, also awarded to Mr. Robles by the trial court, had been sold at a trustee's sale. (*Marlowe* v. *State Bar* (1965) 63 Cal.2d 304, 309 [46 Cal.Rptr. 326, 405 P.2d 150].)

Petitioner boldly asserts that he had the right to execute on Mr. Robles' property "irrespective as to whether the client also had a right to obtain a writ of execution in her favor against the same judgment creditor." Even if the judgment in favor of petitioner had been obtained independently of his representation of Mrs. Robles, we doubt that he could have acquired the property without violation of rule 4. The order compelling Mr. Robles to pay attorney's fees and costs on appeal directly to petitioner, however, was not such an independent judgment because the court renders an award for attorney's fees and costs for the benefit of a party to the action, the attorney's right thereto being derived from that of his client. (Civ. Code, § 4371; *Marshank* v. *Superior Court* (1960) 180 Cal.App.2d 602, 606-607 [4 Cal. Rptr. 593]; *Telander* v. *Telander* (1943) 60 Cal.App.2d 207, 210 [140 P.2d 204]; 6 Witkin, Summary of Cal. Law (8th ed. 1974) Husband and Wife, § 144, pp. 5011-5012.)

Petitioner further argues that Mrs. Robles expressly consented to his levy on the property and to his subsequent purchase of the property at the execution sale. Even if the consent were an "informed" consent, which it does not appear to have been, and even if petitioner were acting in complete good faith, petitioner could still be properly disciplined for violation of rule 4. (*Ames* v. *State Bar, supra,* 8 Cal.3d 910, 917.)

*Dismissal of appeal with view to personal gain.*

 The events which transpired after petitioner acquired the property at the execution sale show a serious course of misconduct on his part. Petitioner entered into an agreement with Mr. Robles' attorney to dismiss his client's appeal in exchange for a quitclaim deed conveying Mr. Robles'

---

[2]Mrs. Robles' appeal would not have been jeopardized had she enforced the judgment of $1,500; she could have continued to prosecute the appeal to seek a larger judgment. (*Browning* v. *Browning* (1929) 208 Cal. 518, 525 [282 P. 503]; *Harrold* v. *Harrold* (1950) 100 Cal.App.2d 601, 605 [224 P.2d 66]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 138, p. 4134.)

right of redemption to petitioner. The board found that petitioner agreed to the dismissal with a view to his own gain and without the knowledge or consent of his client. Such misconduct constitutes an act of moral turpitude (Bus. & Prof. Code, § 6106; *Foote* v. *State Bar* (1951) 37 Cal.2d 127 [230 P.2d 617]) which could have subjected petitioner to criminal prosecution. (Bus. & Prof. Code, § 6128, subd. (b).)[3] Petitioner, however, contends that the evidence does not sufficiently support the board's findings; we disagree.

Mrs. Robles testified that petitioner never informed her that he had agreed to dismiss the appeal in exchange for the quitclaim deed; letters which she wrote to petitioner requesting information concerning the status of her appeal corroborate her testimony. Little evidence in the record supports petitioner's claim that Mrs. Robles had consented to a dismissal. ▉ "Significantly, both the disciplinary board and the local administrative committee disbelieved petitioner; and since the latter saw and heard petitioner and the witnesses against him, this court will give great weight to its findings." (*Lewis* v. *State Bar* (1973) 9 Cal.3d 704, 712-713 [108 Cal.Rptr. 821, 511 P.2d 1173].)

▉ Although the attorney's dismissal of an action without the consent or knowledge of his client does not necessarily establish a violation of section 6128 of the Business and Professions Code, such violation occurs if the attorney agrees to the dismissal "with a view to his own gain." In the instant matter the record fully supports the board's finding that petitioner placed his interests paramount to those of his client.

### Improper method of collecting fees.

In April of 1969, petitioner received more than $3,000 of the proceeds from the sale of the property which he had previously levied upon and purchased at the execution sale. As we have noted, petitioner never notified Mrs. Robles that the property had been sold and that he had received the money. When she eventually contacted petitioner, he informed her that she was entitled to only $900; he failed to account to Mrs. Robles for the money withheld for almost a year after he received it. At that time Mrs. Robles learned that petitioner had deducted $1,000 for his services, as well as an additional $1,000, ostensibly to pay Phill Silver for services performed. Petitioner failed to give Mrs. Robles *any* of the proceeds, including the $900 to which he felt she was entitled.

---

[3]Section 6128 provides in part: "Every attorney is guilty of a misdemeanor who . . . (b) wilfully delays his client's suit with a view to his own gain." Although the statute speaks in terms of "delay," the dismissal of a lawsuit clearly falls within the scope of the prohibition.

After petitioner purchased the property at the execution sale, and thereby acquired an interest adverse to his client, he had a legal duty to hold or sell it for her benefit; the money he received from the sale of the property was therefore money to be held in trust for his client. (*Marlowe* v. *State Bar, supra,* 63 Cal.2d 304, 309; *Tomblin* v. *Hill* (1929) 206 Cal. 689, 694 [275 P. 941]; *McArthur* v. *Goodwin, supra,* 173 Cal. 499, 503.)

Since petitioner did not possess a contractual lien for attorney's fees, he had no right or authority unilaterally to determine that he was entitled to $1,000 for his services and to withhold the money, even if his services in truth were worth that figure. (*Kruger* v. *Wells Fargo Bank* (1974) 11 Cal.3d 352, 368, fn. 24 [113 Cal.Rptr. 449, 521 P.2d 441]; *Brody* v. *State Bar* (1974) 11 Cal.3d 347, 350, fn. 5 [113 Cal.Rptr. 371, 521 P.2d 107]; *Crooks* v. *State Bar* (1970) 3 Cal.3d 346, 358 [90 Cal.Rptr. 600, 475 P.2d 872]; *Trafton* v. *Youngblood* (1968) 69 Cal.2d 17, 28 [69 Cal.Rptr. 568, 442 P.2d 648]; *Most* v. *State Bar* (1967) 67 Cal.2d 589, 597 [63 Cal.Rptr. 265, 432 P.2d 953]; 1 Witkin, Cal. Procedure (2d ed. 1970) Attorneys, § 203, p. 211.)

Petitioner, likewise, had neither right nor authority to withhold $1,000, and to deposit it in his father's business account, for services Phill Silver assertedly rendered to Mrs. Robles between the time the motion for new trial was denied (July of 1968) until he successfully obtained an order for Mr. Robles to pay costs on appeal (January of 1969.) Phill Silver, in fact, never told petitioner that he was entitled to the money. Petitioner testified that his father was willing to waive the entire amount, but had not done so at the time of the hearing.

Of the $3,122.33 petitioner received he was entitled to withhold $34 for money advanced to purchase a clerk's transcript and $165.10 for money he spent to cure a default on the property. Petitioner was not entitled to withhold any other money and thus should have paid Mrs. Robles the balance of the funds, $2,923.23. If Mrs Robles had been unwilling to pay petitioner his requested fee, his sole remedy consisted of an action for the reasonable value of his services. (*Salopek* v. *Schoemann* (1942) 20 Cal.2d 150, 153 [124 P.2d 21]; 1 Witkin, Cal. Procedure (2d ed. 1970) Attorneys, §§ 100, 102.)[4]

---

[4]Petitioner contends that the notice to show cause failed to adequately apprise him of the charge that he wrongfully withheld funds belonging to his client and that, as a consequence, he was denied procedural due process. (*In re Ruffalo* (1968) 390 U.S. 544 [20 L.Ed.2d 117, 88 S.Ct. 1222].) The argument is without merit since the notice to show cause did provide adequate notice.

2. *The Sinclair matter (L.A. 30272).*

After she suffered personal injury and property damage in an automobile accident Bessie Sinclair, on January 14, 1970, retained petitioner to represent her. Thereafter, Mrs. Sinclair's insurance company offered to settle for $1,500, but she felt that the amount was inadequate. After the rejection of the proposed settlement, Mrs. Sinclair moved from Los Angeles to Phoenix, Arizona, and, according to petitioner, she authorized him to settle the case for $2,500.

On November 6, 1970, however, petitioner, without Mrs. Sinclair's knowledge or consent, accepted a settlement from the insurance company for $2,177.75. Although the insurer would not normally have sent a draft for the amount of the settlement until the claimant signed a release from further liability, petitioner convinced the adjuster to remit the draft and the release to him at the same time. Petitioner explicitly promised the adjuster that the funds would not be disbursed until the release had been returned. Despite this promise, petitioner, upon receipt of the draft for $2,000,[5] endorsed it with Mrs. Sinclair's signature, as well as his own, and deposited it in his personal checking account.

Petitioner's checking account was overdrawn by nearly $1,600 on November 18, 1970, the day before the draft was credited to the account; it was again overdrawn, in excess of $300, the day after the deposit.

Petitioner did not notify Mrs. Sinclair that he had settled the claim until December 4, 1970, when he wrote her that she would receive her money when she executed the liability release which he enclosed. Petitioner did not advise her that he had previously received the money and had deposited it in his personal account.

Mrs. Sinclair returned the release to petitioner; shortly thereafter he forwarded it to the insurance company. After the lapse of more than three weeks without receiving the money, and after approximately five unsuccessful attempts to reach petitioner by phone, Mrs. Sinclair contacted him by letter and telegram, demanding that her check be sent. Petitioner then accounted for the money which he withheld and remitted to Mrs. Sinclair a check for $1,233.34, drawn on his client trust account. Although the check was twice returned by the bank for lack of sufficient funds, Mrs. Sinclair eventually obtained her money.

---

[5] $177.75 of the settlement was for medical expenses and was sent directly to the doctors.

The record shows petitioner's consistent pattern of breach of professional responsibility beginning with his agreement to settle Mrs. Sinclair's claim for an amount which was less than she expected. Since petitioner made the agreement without Mrs. Sinclair's knowledge or consent, his conduct constituted a breach of his duty to his client. (*Sampson* v. *State Bar* (1974) 12 Cal.3d 70, 82 [115 Cal.Rptr. 43, 524 P.2d 139]; *Bodisco* v. *State Bar* (1962) 58 Cal.2d 495 [24 Cal.Rptr. 835, 374 P.2d 803].)

Mrs. Sinclair testified that she at no time authorized petitioner to sign her name to any settlement check that he might have received on her behalf. Although petitioner claimed that she had assented to his endorsing the check, the local committee was in the best position to assess the credibility of the witnesses, and we accordingly give great weight to its finding that petitioner endorsed the draft without authorization of his client. (*Sampson* v. *State Bar, supra,* 12 Cal.3d 70, 74; *Fielding* v. *State Bar* (1973) 9 Cal.3d 446, 451 [107 Cal.Rptr. 561, 509 P.2d 193].) ■ An attorney who endorses the name of a client on a settlement check without authorization engages in serious misconduct. (*Montalto* v. *State Bar* (1974) 11 Cal.3d 231, 235 [113 Cal.Rptr. 97, 520 P.2d 721]; *Himmel* v. *State Bar* **(1971)** 4 Cal.3d 786, 798 [94 Cal.Rptr. 825, 484 P.2d 993].)

By depositing the settlement draft in his personal account, petitioner not only broke his promise to the insurance company not to disburse the funds until his client signed and returned the release form but also violated the rule[6] against commingling money belonging to a client with personal funds. Rule 9, as we have previously stated, was "adopted to provide against the probability in some cases, the possibility in many cases, and the danger in all cases that such commingling will result in the loss of clients' money. Moral turpitude is not necessarily involved in the commingling of a client's money with an attorney's own money if the client's money is not endangered by such procedure and is always available to him. However, inherently there is danger in such practice for frequently unforeseen circumstances arise jeopardizing the safety of a client's funds, and as far as the client is concerned the result is the same whether his money is deliberately misappropriated by an attorney or is unintentionally lost by circumstances

---

[6]Rule 9 of the Rules of Professional Conduct of the State Bar provides in pertinent part: "A member of the State Bar shall not commingle the money or other property of a client with his own; and he shall promptly report to the client the receipt by him of all money and other property belonging to such client. Unless the client otherwise directs in writing, he shall promptly deposit his client's funds in a bank or trust company, authorized to do business in the State of California, in a bank account separate from his own account and clearly designated as 'Clients' Funds Account' or 'Trust Funds Account,' or words of similar import. . . ."

beyond the control of the attorney." (*Bernstein* v. *State Bar* (1972) 6 Cal.3d 909, 916-917 [101 Cal.Rptr. 369, 495 P.2d 1289]; *Peck* v. *State Bar* (1932) 217 Cal. 47, 51 [17 P.2d 112].)

█ Good faith, therefore, does not raise a defense to a charge that an attorney commingled funds in violation of rule 9. Similarly, we have previously rejected petitioner's contention that an attorney who does not know of the proscription of rule 9 cannot be disciplined for its violation. (*Zitny* v. *State Bar* (1966) 64 Cal.2d 787, 793 [51 Cal.Rptr. 825, 415 P.2d 521].) Petitioner clearly failed to comply with the requirements of rule 9; he may be disciplined accordingly.

The record also amply supports, the board's finding that petitioner wilfully and knowingly converted Mrs. Sinclair's funds when he deposited the settlement draft in his personal account. Petitioner's defenses to the conversion count are unavailing.

Petitioner urges as a defense that he deposited the draft from the insurance company in his personal account because his bank promptly credited drafts, whereas the bank in which the clients' account was maintained took about 10 days to credit similar instruments. Petitioner purportedly desired immediate credit on the draft to expedite prompt payment to Mrs. Sinclair. █ ██ ██ In support of his claim that he had no intent to misappropriate his client's money, petitioner testified that he had "earmarked" sufficient funds in the clients' account to pay Mrs. Sinclair her share of the settlement.[7]

Petitioner's contention fails in light of the fact that even when he belatedly informed Mrs. Sinclair that he had negotiated a settlement, he did not inform her that he had received the money from the insurance company. The bank records, moreover, undercut petitioner's contention that he "earmarked" sufficient funds in the clients' account to pay Mrs. Sinclair; the account had a balance of only $23.40 a week before, and until several days after, petitioner deposited the draft in his personal account.

Petitioner attempts to explain his failure to send the money to Mrs. Sinclair, as he had promised, after she signed the release for the insurance company. Petitioner testified that he had spent the intervening time trying

---

[7]Petitioner testified that he and his father consistently kept approximately $2,000 of their personal funds in the client account to serve as a "buffer" against erroneously bouncing a check issued to a client. Assuming that petitioner had no intent to pay Mrs. Sinclair with funds belonging to other clients, we note that the practice of maintaining personal funds in a client account is a violation of the commingling prohibition of rule 9. (Fn. 6, *supra; Black* v. *State Bar* (1962) 57 Cal.2d 219 [18 Cal.Rptr. 518, 368 P.2d 118].)

to reduce Mrs. Sinclair's medical bills, pursuant to her request. Since the amount of money that he would be required to send to her depended on whether he would be able to settle with her creditors, he claimed that he withheld payment to her pending negotiations. Since petitioner testified that he spent no more than ten days attempting to compromise the bill, this explanation did not satisfactorily demonstrate why he failed to send the money for more than three weeks, after he received the release and not until after Mrs. Sinclair sent a letter and telegram demanding payment.

Petitioner's attempt to show that he at no time intended to misappropriate his client's money convinced neither the local committee, nor the disciplinary board. ▮▮▮ Petitioner has not sustained his burden before this court of showing that the finding of misappropriation is unwarranted. (Bus. & Prof. Code, § 6083, subd. (c); *Brody* v. *State Bar, supra,* 11 Cal.3d 347, 350; *Black* v. *State Bar, supra,* 7 Cal.3d 676, 690.)[8]

### 3. *The discipline.*

The board recommended that petitioner be suspended for two years, with one year actual suspension, for misappropriating and commingling funds belonging to Mrs. Sinclair (L.A. 30272) and imposed a public reproval for the various acts of professional misconduct committed against Mrs. Robles (L.A. 30164).

Petitioner contends that the recommended suspension in the *Sinclair* matter is excessive and unwarranted. Although this recommendation may be somewhat more severe than some imposed in other cases involving similar misconduct (*Bernstein* v. *State Bar, supra,* 6 Cal.3d 909, 918-919 (30-day suspension); *Himmel* v. *State Bar, supra,* 4 Cal.3d 786, 798-799 (3 months actual suspension, 9 months additional probation)), there are many cases upholding a recommendation of 1 year actual suspension for misappropriation of clients' funds. (*Brody* v. *State Bar, supra,* 11 Cal.3d 347, 350-351; *Bradpiece* v. *State Bar* (1974) 10 Cal.3d 742, 748-749, fn. 1 [111 Cal.Rptr. 905, 518 P.2d 337].) ▮ Although prior cases serve as a guide, the extent of discipline does not derive from a "fixed formula," but rather is determined from a "balanced consideration of the relevant factors." (*Bernstein* v. *State Bar, supra,* 6 Cal.3d 909, 919.)

---

[8]The evidence also shows that petitioner withheld $100 from the money owing to Mrs. Sinclair for attorney's fees for services purportedly rendered in preparing a divorce complaint. Mrs. Sinclair protested petitioner's retention of the money because she felt that she had already paid him. Even if petitioner was entitled to the money, he had no right to retain funds belonging to his client in the absence of a lien. (*Brody* v. *State Bar, supra,* 11 Cal.3d 347, 350, fn. 5; *Crooks* v. *State Bar, supra,* 3 Cal.3d 346, 358.)

The record in the *Sinclair* matter shows that petitioner deposited the draft from the insurance company in his personal account at a time when it was overdrawn. Petitioner's course of conduct demonstrates that he misappropriated the money. Although petitioner may have intended eventually to pay his client, the board took into account many aggravating factors, which it properly considered in making its recommendation. Thus the local committee and the disciplinary board both found that petitioner, in his appearance before the committee, "showed no appreciation of any wrongdoing in signing his client's name without her permission to a check held by him under an agreement that it was not to be deposited or negotiated and depositing same into his own account commingling its proceeds with his own property at a time when his account was in an overdraft condition of $1,589.56. [Petitioner] at no time showed any concern over leaving substantial amounts of his own money in his Client Trust Account." The disciplinary board, moreover, made its recommendation in the *Sinclair* matter without taking into consideration the findings in the *Robles* matter (L.A. 30164), which likewise shows a serious course of misconduct.

▆ Although this court generally attaches great weight to the disciplinary recommendation of the board, we impose more severe discipline when it is warranted. (*Fielding* v. *State Bar, supra,* 9 Cal.3d 446, 452; *Glickman* v. *State Bar* (1973) 9 Cal.3d 179, 184 [107 Cal.Rptr. 65, 507 P.2d 953]; *Sturr* v. *State Bar* (1959) 52 Cal.2d 125, 127 [338 P.2d 897]; *Burns* v. *State Bar* (1955) 45 Cal.2d 296, 303 [288 P.2d 514].) We have previously ordered suspension upon review of a decision of the disciplinary board which only publicly reprimanded the petitioner for professional misconduct (*Noland* v. *State Bar* (1965) 63 Cal.2d 298, 303 [46 Cal.Rptr. 305, 405 P.2d 129]). The misconduct committed against Mrs. Robles warrants suspension. ▆ Thus, as discipline to be imposed as a result of the two disciplinary proceedings, we conclude that petitioner should be suspended not only for two years but three years, with one year actual suspension.

It is ordered that the petitioner be suspended from the practice of law for a period of three years. Execution of such suspension is stayed for the period of three years, during which period petitioner is placed on probation upon the condition that he be suspended for the first year and until he makes restitution to Mrs. Robles in the amount of $2,923.23 plus legal interest and to Mrs. Sinclair in the amount of $100 plus legal interest, and present satisfactory proof thereof to the State Bar. Additionally, petitioner is to comply with the conditions of probation recommended by the State Bar in L.A. 30272. It is further ordered that within 30 days after the effective date

of this order petitioner shall perform the acts specified in rule 955, subdivision (a), California Rules of Court, and that within 40 days after the effective date of this order petitioner shall file with the clerk of this court, with proof of service of a copy on the State Bar at its San Francisco office, an affidavit containing the matters specified in subdivision (c) of the foregoing rule. This order is effective 30 days after the filing of this opinion.

Richardson, J., did not participate therein.

Burke, J., retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council participated therein.